THE SECURITY CO. *vs.* THE BENNINGTON MONUMENT
ASSOCIATION, et al.

October Term, 1897.

Present: Ross, C. J., TAFT, ROWELL, TYLER and MUNSON, JJ.

*Implied Contract—Corporations—Master's Report.*

A corporation may be bound, like any individual, by an implied contract;
yet no one is rendered liable upon an implied promise to pay for services
by the mere fact that they are valuable, but they must have been
performed under circumstances which raise a presumption that the
parties understood that compensation was to be made.

It is not enough that the party rendering the services considers them valu-
able and cherishes a hope that the party benefitted will some time make
him a gift out of gratitude therefor.

The master having found, upon evidence which certainly warranted and
apparently required the finding, that the services were rendered with the
understanding that they were not to be paid for, the report must be
accepted and the bill dismissed.

The resolutions adopted by the defendant association touching compensa-
tion for the services in question are to be interpreted by the circum-
stances which prompted and explain their passage.

A master's findings are not to be reviewed nor revised when there is evidence
to sustain them, unless fraud or corruption is shown.

BILL IN CHANCERY.  Heard upon pleadings, master's
report and orator's motion to set aside the report, at the
December Term, 1896, Bennington County, before *Thompson,*
Chancellor.  The motion was overruled and the bill
dismissed.  The orator appealed.

*W. B. Sheldon* and *Barber & Darling* for the orator.

*Batchelder & Bates* for the defendant association.

Ross, C. J.  This is an appeal from the decree of the court
of chancery dismissing the orator's bill.  By its bill, the
orator alleges that Charles M. Bliss had rendered services of
great value for the defendant, under such circumstances that
the defendant is legally obligated to pay for them, and that
he had expended large sums of money in its behalf, for

which the defendant is indebted to him. The orator further alleges that it held a trust fund for the use of Mr. Bliss, and that it advanced him from the trust fund to expend for the use and in the business of the defendant, on the representations of Mr. Bliss that the same would be repaid by the defendant, from money due and to become due him from the defendant, and that later Mr. Bliss assigned his claim for services, and money expended for the defendant, to the orator. In its answer, the defendant denies that it is indebted to Mr. Bliss, in any manner, for services or for money expended in its behalf. The trial of these issues was referred to a special master. During the trial a mass of testimony was taken and a great number of exhibits introduced. The master returned a lengthy report of his findings. On the coming in of his report, the orator filed exceptions thereto, and procured its recommittal for further findings. When these were made by the master, the orator filed further exceptions and moved that the report be again recommitted to the master for further findings. This motion was denied by the chancellor. The orator thereupon filed a lengthy motion, setting forth a great many reasons why the master's report should be set aside. The case came on for hearing on this motion, and on the master's report. The court after a lengthy hearing denied the motion, and dismissed the orator's bill. The case relates to the erection of the Bennington Battle Monument, and is itself a monument to the industry of the solicitors and master. The case covers one hundred twenty-five printed pages, the testimony, over twelve hundred type written pages, accompanied by two hundred and seventy-five exhibits. The briefs for the orator contain one hundred and eighty printed pages. The other brief is not so lengthy. The period of time covered is twelve years, from 1876 to 1888. The defendant was chartered by the legislature in the fall of 1876, organized in January, 1877. Charles M. Bliss was its secretary for the first year, corresponding

secretary for the next ten years, director during the years 1886 and 1887, and chairman of the committee of five from August, 1885, to January, 1887.   In January, 1888, he withdrew from the Association, and assigned his claim against it to the orator soon thereafter.   The orator claims there is due Mr. Bliss, from the defendant, over twelve thousand dollars.

On this mass of material the orator makes in substance but two contentions.

First, that, on the facts found by the master, the orator is entitled to recover some sum and that the case should be recommitted to the master, or some other master, to find what that sum is.

Secondly, if the first contention is not sustained, that the master's report should be set aside, and the case be heard *de novo*.

In considering these contentions, it must be borne in mind that the defendant is not an ordinary stock corporation, chartered and organized for carrying on a business and making money for its stockholders, but a purely public and patriotic association, chartered for two public and patriotic purposes: first, fittingly to celebrate the centennial of the Battle of Bennington and the centennial of the State, as one of the United States; and, secondly, to erect a suitable monument to commemorate, for all time, the Battle of Bennington.

(1)   To determine whether upon the master's report the orator is entitled to recover some sum for the services and expenses of Mr. Bliss the entire report needs to be considered. The orator selects the resolutions of May 9, 1877, and contends that upon those resolutions alone, supplemented by the further facts found, that Mr. Bliss continued his services and expenditures after, the same as he had done before, their adoption, the orator is entitled to recover some sum, notwithstanding all the other facts found and reported in regard to the circumstances which caused those resolutions

to be adopted, and in regard to the understanding of Mr. Bliss and of the officers of the Association, that his services and expenditures were voluntarily rendered, to promote the interests of the Association, without expectation that payment would be demanded, or made therefor. He does not contend that the orator can recover unless when the services were rendered and expenditures made Mr. Bliss and the officers of the Association mutually understood, or ought to have understood, that the Association was to pay for such services and expenses. He cites, as a statement of the law governing such cases, what is adopted by the United States Supreme Court in *Fitzgerald* v. *Fitzgerald*, 137 U. S. 98, and found expressed in *Pew* v. *First National Bank*, 130 Mass. 391, as follows: "A bank or other corporation may be bound by an implied contract in the same manner as an individual may. But, in any case, the mere fact that valuable services are rendered for the benefit of a party does not make him liable upon an implied promise to pay for them. It often happens that persons render services for others which all parties understand to be gratuitous. Thus, directors of banks, and of many other corporations, usually receive no compensation. In such cases, however valuable the services may be, the law does not raise an implied contract to pay by the party who received the benefit of them. To render such party liable as a debtor under an implied promise, it must be shown, not only that the services were valuable, but also that they were rendered under such circumstances as to raise the fair presumption that the parties intended and understood that they were to be paid for; or at least, that the circumstances were such that a reasonable man in the same situation with the person who receives and is benefited by them would and ought to understand that compensation was to be paid for them." We regard this as a fair and careful statement of the law of the subject. Apply it to the resolutions of May 9, 1877, read in the light of circumstances attending

their adoption by the directors of the defendant. The resolutions read, "Resolved, that the board of directors of this Association are authorized in their discretion to pay Charles M. Bliss not to exceed two dollars per day for the time spent as secretary of the Association and for such services as they think the interests of the Association require from this date until otherwise ordered by the Association; and the board of directors may employ such other assistance as they may deem necessary to promote the interests of the Association: "Resolved, that Charles M. Bliss be paid the sum of one hundred dollars for expenses incurred while acting for the Association and that a further sum of one hundred dollars be paid to him for services as secretary of the Association to date."

These circumstances, briefly stated, ante-dated and attended the adoption of these resolutions. Mr. Bliss was a man of education and refinement, possessed of a great fund of information relating to men and events of the American Revolution, residing, in 1875, in Bennington, without a family and without business. He possessed but limited financial ability. When, during that year, the prominent men of Bennington began to agitate the idea of having in 1877 a centennial celebration of the Battle of Bennington and of the admission of the State of Vermont into the Union, and of erecting a monument commemorative of that battle, Mr. Bliss entered actively and heartily into all movements in that direction, and, in various ways, gave most of his time and efforts to it, became an active member of the Bennington Historical Society; devised and advocated the scheme to have the States of Vermont, New Hampshire, and Massachusetts join in erecting a monument and to ask Congress to aid in the work, and, as a means of getting an appropriation from the General Government, to urge upon Congress the propriety of erecting a monument upon each of the battle fields of the Revolution. This scheme outlined

by him, resulted in the Historical Society asking the legislature in 1876 to pass an act incorporating The Bennington Battle Monument Association. Mr. Bliss was chairman of a committee to draft the act, did so, and went, with others, before the legislature and urged its passage. The people of Bennington, by subscription, raised one hundred and fifty dollars to pay his expenses while before the legislature on this business. He kept no account of his time nor expenses while employed in promoting the passage of the act.

The act made appropriations for the celebration and for a monument. It provided that the Governor should invite Massachusetts and New Hampshire to unite with Vermont in the erection of the monument. Before the Association was organized, Mr. Bliss, without knowing whether the Governor had extended the invitation required by the act, went to Massachusetts and presented to its Governor a request of the Historical Society to have that state join and make an appropriation for the erection of the monument. The Historical Society, January 29, 1877, passed a vote of thanks to Mr. Bliss "for his earnest and effectual work for the interest and welfare of the Society," and paid him a small sum for postage and stationary, and expenses to Boston. The Assosiation never voted to pay for any of his services or expenses rendered in promoting the creation of the Association. The orator can recover nothing on account of them. *Hall* v. *Vt. and Mass. R. R. Co.*, 28 Vt. 401; *Hodges* v. *R. & B. R. Co.*, 29 Vt. 220. While the services and expenses rendered by Mr. Bliss as a promoter of the Association cannot be considered as laying any foundation for an obligation on the part of the defendant to pay the orator for them, they can and ought to be considered as showing his interest in the objects to be attained by the Association, and his willingness to render services and incur expenses, gratuitously, in behalf of the Association. The Association was organized January 10, 1877. Mr. Bliss

was elected its secretary and had to make the necessary records in that behalf.   He was *ex-officio* secretary of the Centennial Commission created by the Association.   This Commission included all the members of the Association and many other prominent citizens.   The Association, in addition to the two thousand dollars appropriated by the State, had to raise over eleven thousand dollars to enable it fittingly to celebrate the centennial of the Battle of Bennington and of the admission of the State into the Union.   Mr. Bliss was also a member of the literary committee for that celebration.   He with the other officers of the Association and prominent citizens, was giving his time and incurring expenses preparatory to making the celebration suitable and fitting to the occasion.   The act of incorporation, as drawn by him and presented to the legislature, provided for paying the secretary a salary. This provision was stricken out by the committee who had the bill in charge as objectionable.

The Association when organized made no provision for compensating its secretary nor any of its other officers to May 9, 1877, when the resolution was adopted, and then, Mr. Bliss made no claim that he was entitled to pay for his services and expenses, nor had the directors to that time taken any action on the subject.   Individually they did not understand that Mr. Bliss claimed pay for his services, nor that any of the officers of the Association were to receive pay for their services, but understood all such services were of a patriotic character, rendered without expectation of any pecuniary reward.   It was understood, however, that when one went abroad under the direction of those in authority, or in performance of duties specially assigned, and then only, he would be reimbursed for his expenses.

Since the organization, Mr. Bliss's time had been fully occupied by duties incident to his official position, in the discharge of which he had made several journeys.   He had

spent some money in traveling expenses, the exact amount of which did not appear.   Under these circumstances, the finance committee, while canvassing the State to solicit donations, found an impression existing that Mr. Bliss was getting his living out of the Association, which interfered with the success of their work.   To put at rest this impression, and make sure of the future, the matter was called up and discussed by the directors and the resolutions adopted.   Considered in the light of these circumstances, we think the first resolution was intended to, and does, clearly negative the right of Mr. Bliss to charge, or to expect pay, for his services rendered the Association as its secretary, or otherwise, under the requirements of the directors, except so far as the directors, acting as a board, authorized such payment, which in no case should exceed two dollars per day.   If he was to receive something, in any event, for such services, it could not rest, as made to by the resolution, wholly in the discretion of the directors. The authorization was to be exercised in their discretion only, and that discretion could not exceed the *per diem* named.   This construction, and this only, would effectuate the purpose for which the resolution was passed,—rebut the impression that he was getting his living out of the Association by virtue of his official connection with it. The second resolution supplements the purpose of the first by settling with Mr. Bliss up to that date.   Hence, these resolutions do not support the contention of the orator's solicitors, that they recognize that Mr. Bliss was to be compensated for his services as secretary by virtue of his office, without any action of the directors.   It is only on this contention that he claims that the orator is entitled to recover some sum notwithstanding the other facts found by the master.   The construction we have placed upon these resolutions is the same placed upon them by Mr. Bliss and by the directors of the Association.   The directors never took any action under the resolutions except to pay the

money voted, nor did Mr. Bliss during the ten following years ask them to. Both parties went forward under the understanding existing at the time the resolutions were adopted, that none of the officers of the Association were to receive pay for official services rendered, nor for expenses except when they "went abroad under the direction of those in authority, or in performance of duties specifically assigned." This is abundantly shown by the facts reported by the master.

September 12, 1877, the Association called upon the executive committee of the Centennial Commission and its treasurer to make a detailed report on collections and all disbursements for the Centennial Celebration of August 16th and 17th. October 1, 1877, in answer to Mr. Bliss's resolution, which was then adopted, the report was made, showing a balance of $470.15 on hand, which was transferred to the defendant. In it there is an item of $734.44 for traveling and sundry expenses of committees. The master finds that the expenses of Mr. Bliss as a member of the literary committee were included in this item. We think these facts;—that this settlement was made with the knowledge of Mr. Bliss, made to ascertain what sum the Commission had, after all bills incurred by it were paid, to transfer to the Association, that the expenses incurred by him as one of the literary committee were incurred under this Commission, that he then made no claim to have them allowed to him, and that the expenses of the executive committee were only about fifty dollars,—have a tendency to establish the fact found from them by the master.

At the annual meeting of the Association, holden January 14, 1878, a financial agency, or committee, was created for the purpose of raising money, and authorized to put in operation such measures, and to employ such agents, as it might deem proper, and were invested with full power and discretion in the premises. August 16, 1882, the Association withdrew the power of employing agents, and ordered the

committee to terminate all existing contracts for obtaining subscriptions, and "to cause a settlement to be effected with any and all persons who may have been engaged in obtaining subscriptions, or in rendering services for the Association in any other way upon any claim or expectation of compensation." Considerable of Mr. Bliss's claim accrued in this way. He knew of this resolution, and was called upon, under it, by one authorized to settle with him. He said to that person that he had no claim of any character against the Association, and this was reported to the Association. Again, at the annual meeting of the Association in 1885, reports having become current that Mr. Bliss was working for the Association with the expectation of receiving pay therefor, and that he considered the Association largely indebted to him, on being inquired of he publicly stated that "he was not, and had not been, serving the Association for pay, that he had no claim against it on account of services, and that the Association owed him nothing."

In 1886 the legislature conditionally appropriated ten thousand dollars to purchase a site for the monument, and created a commission to make the purchase when the Association furnished a satisfactory guarantee that the monument should be commenced within six months after the site was secured, and that it should be completed within five years thereafter. This led the commissioners to inquire into the financial condition of the Association. On learning how much in cash, and state and government appropriations, the Association had, they inquired what claims, if any, existed against the Association. Among others they inquired of Mr. Bliss, and whether he had any claims against it. He "assured them that he had no claims against the Association for services and that the Association had paid him his expenses." Mr. Bliss does not deny having made these various statements, in substance. The last statement was made January 5, 1887. He now says, when

he made these several statements he did not suppose he had any claim against the Association enforceable at law or in equity, but that he had not then taken legal advice which he now has done.   He had, in all, by private subscription made by the friends of the enterprise, and by the Association, been paid considerably over one thousand dollars.   The last payment was made in May, 1886, and was understood to be in full for his allowable expenses to that date.   The directors understood these statements to be true when made, and acted in reliance upon them.   Mr. Bliss's activities and services were not confined to the discharge of his official duties, but extended into every department, even when specially assigned by the Association to committees or other officers.   Notwithstanding the raising of money was given into the hands of a financial committee, Mr. Bliss was active in securing individual donations and State and congressional appropriations.   Frequently when he went abroad on this work his expenses were paid, either by individual donations or by the Association, and he was sent or allowed to go upon these missions upon the understanding of those in authority, that his going would cost the Association only his expenses.   His work in this department was sometimes effective and sometimes without beneficial results.   Notwithstanding the Association had a special and able committee on the design of the proposed monument, Mr. Bliss bestowed a vast amount of time, labor and expense upon this department of the work, very much of which was in opposition to, and for the overthrow, and  resulted  in  the  overthrow  of  the  work  of  the committee.   It  has  apparently  proved  that  he  was frequently right in his ideas which led to such opposition. But however superior—if they were superior—his own ideas on the subject of a proper design were to those of the committee on design, it cannot with propriety be held, that he, or those in authority under the Association, reasonably expected he was to receive pay for his services and expenses

rendered in opposition to the labors of the properly appointed committees of the Association. A careful reading and study of the whole case, including master's report, exhibits, testimony and briefs, especially the testimony of Mr. Bliss, leaves a firm impression that his ideas of the importance of the event to be commemorated, of the kind and style of monument appropriate for that purpose, and of the measures and means necessary to be employed to secure it, were frequently in advance of many, if not most, of his associates; that he was firmly impressed with their superiority, could be and was helpful to those who agreed with him, could not work with, but thought he must convert or obstruct, those members of the Association, or its officers, who entertained any different ideas. Hence his services and expenses were regarded by his associates as sometimes, and in some places, serviceable, and were authorized, and his expenses abroad paid; but, quite as often, as not serviceable, but otherwise, hence not authorized; yet, from his make up, he thought them necessary, and rendered them without authority. This condition of things extended through his work down to January 5, 1887, when he stated to the Commissioners of the State, in the presence of the officers of the Association, that he had no claim against the Association for services and that the Association had paid him his expenses. Thereafter it does not appear that he did any authorized work away from home. He had ceased to be a member of the committee of five, and held only the offices of corresponding secretary and director. April 12, 1887, the board of directors appointed a building committee, to whom was referred "all subjects relating to the building of the monument, such as design, size of monument, contracts for stone and labor, employment and engineers, and the covering of all money now appropriated into the treasury of the Association." Mr. Bliss entertained different ideas on many of the subjects specified from what the committee

appointed did, wanted to be placed on the committee, was dissatisfied that he was not, never did any active work in favor of the Association thereafter, and withdrew therefrom at the annual meeting holden in January, 1888. Mr. Bliss testified that the appointment of the building committee with the power conferred, took the tools with which he had been working, and was wishing to continue to work, out of his hands. Upon his withdrawal the Association passed commendatory resolutions. The master closes his findings on this subject, saying: "Up to this time Mr. Bliss had not thought of presenting to the Association a claim to be compensated for his services. His expenses, incurred in the performance of duties imposed by his official connection with the corporation, and in duties delegated to him especially by those having authority, had been paid in full." "There had been no arrangement with him, by the directors, under the resolution of May second, (ninth) 1877, and, in fact he ceased to be secretary on his election as corresponding secretary, at the annual meeting in the January following. He understood that no one in the Association had any right to demand pay for services rendered and that no one expected compensation. That his services were rendered, and expenses incurred, without thought of further claim against the Association is shown by the fact, that, during the ten or more years occupied by the project, he never kept any accounts with the Association; he never made a charge against it even for money expended; it does not appear that he so much as kept an expense account when travelling, nor a diary showing his whereabouts during any portion of the time, and is now unable to make any intelligent statement of the amount of his expenditures, his only method of reaching a conclusion touching the amount of the same being an estimate."

"On the other hand, Mr. Bliss really believed that to his efforts more than to those of any other person the Association was indebted for the success it obtained in

the selection of an appropriate design, in securing necessary funds with which to erect the monument, and, generally speaking, for the success of the undertaking; and that the Association ought in honor, to compensate him; and he cherished the hope that at sometime a sum of money would be voted to him from the treasury of the Association as' a gift."

If the master had added as he might have done because it was uncontroverted, and which the orator complains of him for not doing, that the association kept no account with Mr. Bliss, that fact would have added only to the conclusiveness of the facts reported; for it would have shown that the association did not understand it was dealing with him as its creditor. These facts under the law claimed by the orator, conclusively show that the orator is not entitled to recover, nor is their conclusiveness at all shaken or varied by the facts reported not heretofore referred to.

The solicitor for the orator claims in his brief that the resolutions of May 9, 1877, created some kind of a trust relation between Mr. Bliss and the association, which the orator has the right to have enforced. If we have correctly construed the resolutions, they created no such trust relation, but placed the matter of compensation for Mr. Bliss's official and specially authorized services and expenses in the hand of the directors, for him to deal in regard thereto with the board of directors, and without such deal, no indebtedness, direct nor by implication, arose against the association in favor of Mr. Bliss. By them Mr. Bliss understood, or ought to have understood, that the directors held the funds of the association in trust solely for the accomplishment of the purposes set forth in its charter, to be guarded by them against any diminution except for services and expenses contracted for and authorized by the board when acting officially. No judgment for the orator could legally have been rendered on the master's report.

II. The motion to have the report set aside and the case

heard *de novo*, covers many printed pages and indicates many points in regard to which the mover thinks the master ought to have found differently. When listening to the argument of the solicitor, and on careful examination of the motion and the testimony, we fail to find any material fact, found by the master, in regard to which there was not evidence submitted tending to support his finding. His findings will be neither reviewed nor revised where there is evidence to sustain them unless fraud or corruption is shown. *Waterman* v. *Buck*, 58 Vt. 519; *Howard* v. *Scott*, 50 Vt. 48; *Merrill* v. *C. Vt. R. Co.*, 54 Vt. 200; *Randall* v. *Randall*, 55 Vt. 214.

It would contribute nothing to the law of the case to take up and point out *seriatim* the evidence tending to support the various findings by the master brought under consideration by the motion. The charges of fraud and corruption are wholly unsupported. Such charges should never be made unless the solicitor knows of, and produces, substantial evidence to sustain them. Whether he should have found, as urged, that Mr. Bliss was insolvent, rather than, "a man of moderate means," is immaterial to the decision of the case. If found as claimed by the orator, it would not affect the proper judgment to be rendered. Neither does the omission of the master to find the value of Mr. Bliss's services rendered and expenses incurred injure the orator, so long as it is found that the defendant was not indebted to him for any portion thereof not already paid. The solicitor has placed much stress upon his claim that the master did not give proper force to the assignments by Mr. Bliss to Mr. Child, to Henry I. Bliss and to the orator, and to various votes of the association when voting money to him. These were all to be considered in connection with the other evidence in the case, particularly in connection with Mrs. Bliss's acts and declarations, and the acts of the association and the acts and testimony of its officers who were authorized to carry on particular branches of its

business.   The assignments, votes and resolutions are all set forth by the master.   The assignment to Mr. Child was paid by the Association from what it conceded it owed him for expenses when abroad under the authority of its proper officers.   Mr. Henry I. Bliss never notified the defendant of the assignment to him, nor made any claim under it.   That Mr. Charles M. Bliss notified it that he had made such an assignment, did not place the association under any duty arising therefrom to Mr. Henry I. Bliss.   It could not thereby shield itself from being held as the trustee of Mr. Charles M. Bliss if it was in any way indebted to him, and had been trusteed.   The assignment to the orator was made after Mr. Bliss had ceased to act in any capacity in behalf of the defendant.   After so lengthy and expensive a hearing by a master eminent in the profession, probably, as is usually the case, appointed with the concurrent approval of the parties, some substantial legal reason should be clearly shown to exist for setting aside his report and granting a rehearing by the same, or another, master.   No such reason has been brought to our attention.   In short, a careful reading and study of the testimony and exhibits leaves the firm impression that the master could have come to no different conclusion than he did, as quoted near the close of point one, and as further shown near the close of his report, if he treated the testimony of the various witnesses, including that of Mr. Bliss, as true, and undertook to reconcile the testimony of each with that of the others, and with the records and exhibits.   We have not overlooked, but have given no prominence to the attempt of the directors of the association to settle with Mr. Bliss in 1889.   No common understanding was reached and no settlement concluded.   It was no more than evidence in the case, considered by the master, as stated in the report.

*Decree affirmed, cause remanded.*